## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Terrence Dupont, being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since April 2013. I am currently assigned to the Economic Crimes squad with the Boston Division of the FBI. Prior to this assignment, I spent two years on the Health Care Fraud squad and four and a half years on the Philadelphia Division's Public Corruption squad. During my time in the FBI, I have participated in white collar crime investigations relating to many different violations, including mail and wire fraud, money laundering, honest services fraud, and aggravated identity theft, among others. I have also been the affiant on numerous probable cause affidavits.

2. Pursuant to this affidavit and criminal complaint, I seek to charge CHRISTOPHER R. ESPOSITO with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

3. In 2019 and 2020, ESPOSITO was the sole officer, director, and employee of the company Code2Action, Inc. I have probable cause to believe that, in or about August 2019 through in or about February 2020, ESPOSITO: (i) deliberately misled prospective investors about, among other things, Code2Action's plan and ability to complete a reverse merger; (ii) misappropriated tens of thousands of investors' dollars to pay his personal expenses; and (iii) failed to disclose to prospective investors, among other things, that the U.S. Securities and Exchange Commission ("SEC") had obtained a final judgment against him for committing securities fraud and barred him from certain securities-related activities.

4.      Because this affidavit is being submitted for the limited purpose of demonstrating that there is probable cause to arrest ESPOSITO on the federal criminal charge set forth above, I have not included each and every fact known to me and to other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested warrant.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses.

### RELEVANT ENTITIES, DEFINITIONS, AND INDIVIDUALS

5.      Defendant CHRISTOPHER R. ESPOSITO, age 54, is a resident of Everett, Massachusetts.

6.      At all relevant times, Code2Action, Inc., was a private Delaware corporation based in Massachusetts for which ESPOSITO served as the sole officer, director, and employee.

7.      The SEC is an independent agency of the executive branch of the United States government.  The SEC is responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder.

8.      Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws.  These stocks are, as a general matter, securities of companies that have a low market capitalization and a low price per share (frequently, though not always, $1 or less).  When traded publicly, microcap stocks are most often traded on the "over-the counter" market, rather than on national exchanges such as the New York Stock Exchange or the NASDAQ, and tend to be thinly traded.

9.      A reverse merger is a transaction in which a private company acquires a publicly traded company, thereby allowing the private company to transform into a publicly traded

company without completing an initial stock offering themselves.  Often the public company in a reverse merger is a "shell" company with minimal assets and liabilities and no actual operations.

## ESPOSITO'S SEC JUDGMENT

10. In May 2016, the SEC filed a civil action against ESPOSITO and others in the United States District Court for the District of Massachusetts alleging violations of the anti-fraud provisions of the federal securities laws.  The SEC's complaint alleged that ESPOSITO engaged in a scheme to defraud investors by (i) misappropriating investor funds and (ii) concealing his ownership and control of a publicly-traded microcap company in order to enrich himself and others by selling company shares in violation of the securities laws and SEC regulations.

11. ESPOSITO defaulted in the litigation after he failed to appear for his deposition.  The court entered a final judgment against him in April 2018.  The final judgment permanently enjoined ESPOSITO from, among other things, (i) violating the anti-fraud provisions of the federal securities laws, (ii) serving acting as an officer or director of certain public companies, and (iii) participating in any offering of a penny stock, including by attempting to induce the purchase or sale of any penny stock.

12. The final judgment also ordered disgorgement of $980,761, prejudgment interest of $126,652, and a civil penalty of $160,000.  To date, ESPOSITO has not made any payments toward satisfying these obligations.

13. In or about July 2019, ESPOSITO spoke with a confidential witness (CW-1) in a phone call that was consensually recorded.[1]  During the call, ESPOSITO discussed his then-

---

[1] CW-1 participated in the securities fraud scheme underlying the May 2016 SEC enforcement action against ESPOSITO discussed above and has agreed to plead guilty to conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371.  CW-1 is cooperating with the government in hopes of receiving leniency at sentencing.  The information CW-1 has

current business pursuits, which included introducing a friend with a private business to potential investors. ESPOSITO explained that he was permitted to make such introductions pursuant to "finder fee" agreements so long as he did not solicit investors, because he was "not supposed to be in the penny stock business."

## ESPOSITO'S FRAUD SCHEME

14. I have probable cause to believe that, from in or about August 2019 through in or about February 2020, ESPOSITO offered to sell, and did sell, Code2Action shares to existing Code2Action shareholders at sub-penny prices based on material misstatements and omissions and then misappropriated much of the proceeds to pay personal expenses.

*Code2Action's Revival*

15. ESPOSITO's fraud scheme began with his revival of Code2Action in early 2019. Code2Action had been incorporated in Delaware in or about 2013, but its charter became inoperative in or about 2017 due to non-payment of taxes and/or failure to file an annual report. In or about March 2019, ESPOSITO returned Code2Action to good standing in Delaware, which required paying Delaware approximately $2,324. Bank records indicate ESPOSITO payed for Code2Action's revival with Delaware from his personal funds.

16. In a voluntary interview with me in August 2020, ESPOSITO explained that he revived Code2Action in order to settle a debt between Code2Action and another company. Prior to going dormant, Code2Action's purported business involved selling a mobile marketing and advertising service that sent marketing messages to prospective customers via text messages. Public filings with the SEC reflect that, in or about May 2015, Code2Action licensed its

---

provided has been corroborated by, among other things, documents and witness interviews. CW-1 made the July 2019 call with ESPOSITO at the direction of law enforcement agents.

supposed text-messaging technology to a public company (Company A) in exchange for a $500,000 convertible promissory note. ESPOSITO, who had been Code2Action's chief executive officer ("CEO") at that time, subsequently became Company A's CEO, and Code2Action thereafter effectively went dormant. ESPOSITO remained with Company A until approximately the spring of 2018, when he departed Company A amid a dispute with its new management about, among other things, the validity of the convertible promissory note.

17. ESPOSITO thereafter negotiated a settlement agreement with Company A. The settlement agreement called for Company A to issue shares to Code2Action's existing shareholders. Records maintained by ESPOSITO reflect that, at or about that time, Code2Action had just under 100 shareholders, holding approximately 97 million Code2Action shares.

18. ESPOSITO explained that, having revived Code2Action's corporate form in order to effectuate the settlement with Company A, he then decided to also revive Code2Action's business. As described below, soon after reviving Code2Action, ESPOSITO began soliciting existing Code2Action shareholders to purchase additional shares. The core of ESPOSITO's investment pitch was that he was going to soon reverse merge Code2Action into a public shell company, at which point Code2Action's shareholders would supposedly be able to sell their shares (both old and new) in the public market at a profit.

*Initial Investor Solicitations & False Statements Regarding Merger*

19. On or about August 1, 2019, ESPOSITO sent the first of many solicitation emails to existing Code2Action shareholders, including numerous shareholders who live outside Massachusetts. ESPOSITO informed the shareholders that each was "still in fact a shareholder of Code2Action" and that the "spin-off of [Company A] did not replace, remove or reduce you [sic] holdings/percentage of ownership in the core business, Code2Action Inc." ESPOSITO

5

went on to represent that Code2Action's "core business, a text/sms mobile marketing platform has been revived."

20. In truth, Code2Action had not "revived" its "mobile marketing platform." Instead, ESPOSITO had simply purchased a publicly available marketing service from a third-party company for approximately $160 per month (the "Third-Party Platform"). In his interview with me, ESPOSITO referred to this as "white labelling" the Third-Party Platform. At no point did ESPOSITO share with Code2Action's existing shareholders (i.e., his prospective investors) that Code2Action's "platform" consisted of this white labelling arrangement. In addition, at no point between August 2019 and February 2020 did Code2Action have any business revenues; instead, the only money Code2Action received came from existing shareholders who purchased additional shares.

21. ESPOSITO's August 1 email then introduced his investment pitch, which centered on a "Rights Offering" that he offered to existing shareholders (i.e., prospective investors). Pursuant to the offering, each shareholder had the opportunity to purchase three additional shares at $0.001 per share for every share they already owned, which would "raise approximately $300,000 in new capital" for the company.[2] ESPOSITO further explained that he had "begun the process in seeking a publicly trade [sic] shell Company in which to merge Code2action before the end of 2019" and that "the merger would be a share exchange in which Code2action shareholders would receive free trading shares in the public Company." ESPOSITO also shared that he was in discussions with a "food license and distribution business"

---

[2] In order for Code2Action to have sufficient shares available to sell pursuant to the Rights Offering, ESPOSITO simultaneously organized a shareholder vote authorizing Code2Action to increase its authorized shares from 100 million to 400 million.

about using Code2Action's "text/sms platform" for marketing purposes in connection with a frozen pizza line.

22.     Within a week, ESPOSITO informed prospective investors that he had found a shell company for the reverse merger.  Over several emails, ESPOSITO explained that Code2Action was "now moving forward with plans to merge" into a shell company he had found and that the "majority of the proceeds from the Rights Offering"—$225,000—would be "used to acquire the publicly traded Company for [sic] which C2A will merge."  ESPOSITO further explained that the transaction would require a $50,000 deposit and $175,000 within 90 days to close the merger.  In emails to individual prospective investors, including to a shareholder who later invested $5,000 (Investor 1), ESPOSITO reiterated that the "majority of the funds from the rights offering would be used to purchase the shell."

23.     ESPOSITO further represented that "[w]e plan to secure the shell purchase by the end of next week" based on purported commitments he had already received from some Code2Action shareholders.  ESPOSITO also previewed in these emails how lucrative this supposed opportunity would be, stating that "[w]e plan to commence trading" at 15 to 20 times the rights offering price of $0.001.  ESPOSITO noted that this would equate to a $6 million company valuation.

24.     As August continued, ESPOSITO continued to represent that he was on the cusp of having raised sufficient funds to make the $50,000 deposit.  On August 8, ESPOSITO emailed a shareholder who later invested in the Rights Offering (Investor 2), stating that Code2Action had "approx. $32,000 coming in next week."  On August 12, in a group email to prospective investors, ESPOSITO claimed that he had "funds coming in this week that will enable me to secure the public shell with $50k deposit."  On August 13, in an email to Investor 1, he

represented that the reverse merger "may be as early as September" and that he planned "to put a deposit on the shell soon." And on August 19, in an email to another shareholder who also later invested in the Rights Offering (Investor 3), ESPOSITO stated that "yes money has come in and lots coming this week" and that he "will make deposit on the shell by weeks end."

25. In fact, contrary to these representations, Code2Action had received no investor funds as of August 19 (i.e., when ESPOSITO sent the aforementioned emails). Instead, the company's bank account, which ESPOSITO opened on or about August 13 and funded with a $100 cash deposit, had a balance of only $5.50 on August 21. What's more, at no time in August or September 2019 did ESPOSITO raise or maintain anywhere near the $50,000 he had told investors he would soon pay as a deposit on a shell company. ESPOSITO acknowledged this fact during an interview with me on August 6, 2020. At its peak in September 2019, Code2Action's bank account had a balance of only $10,985 (all from investor funds), which, as discussed below, ESPOSITO quickly spent down to nearly $0.

*Use of Investor Funds for Personal Expenses & Continued False Statements*

26. Following his email solicitations, Code2Action began to receive investor funds starting in late August 2019 pursuant to the so-called Rights Offering. Contrary to ESPOSITO's representations that the funds would be used to purchase a shell company, however, ESPOSITO used the funds primarily to pay himself, pay Code2Action's limited business expenses (or reimburse himself for the same), and pay his personal expenses. ESPOSITO's use of investor funds to pay his personal expenses ran contrary both to his representations about the supposed reverse merger plan and to the offering circular ESPOSITO provided the prospective investors.

27. ESPOSITO provided his prospective investors with a "Rights Offering Circular" that he prepared and that described the terms of the offering, including what was being offered

(i.e., shares of Code2Action), the price ($0.001 per share), the expiration date (originally August 23, 2019, but extended repeatedly), and how the proceeds from the offering would be used. The Offering Circular also included a "Rights Certificate," which was a form for identifying the number of shares an investor was purchasing and which ESPOSITO asked investors to fill out and sign.

    28.    The Offering Circular stated in two places that the proceeds from the Rights Offering would be used only for business purposes. Specifically, the Offering Circular provided:

    a.    "The net proceeds of this offering … will be used to offset incurred expenses and pay for future costs pertaining to legal fees, acquisition costs, operational costs, working capital and general corporate purposes, with the remaining proceeds to accelerate marketing campaigns, and other operating working capital needs."

    b.    "The net proceeds of the Rights Offering estimated to be $290,000 will be used for the following through year end 2019, legal and accounting expenses, acquisition costs, operational costs, sales and marketing expenses, salaries, working capital and general corporate purposes."

The Offering Circular also included language noting that "there may be circumstances where, for sound business reasons, a reallocation of the available funds may be necessary." The Offering Circular stated, however, that "in any event[,] the available funds will be used by the Company in furtherance of its business."

    29.    The Offering Circular also provided an anticipated timeline for the reverse merger that ESPOSITO was touting. The Offering Circular represented that shares purchased pursuant to the Rights Offering would "commence trading upon the successful acquisition and merger into a publicly traded Company, anticipated to be consummated within 30-60 days of the conclusion

of this Rights Offering." Neither the Offering Circular, nor any of ESPOSITO's emails to prospective investors, included a disclosure about the SEC's final judgment against ESPOSITO or the SEC bar orders.

30. On or about August 20, 2019, Investor 2 became the first of approximately 15 Code2Action shareholders to purchase additional shares pursuant to the Rights Offering outlined in the Offering Circular. A pattern thereafter emerged: as the investor funds came in the door, ESPOSITO promptly spent them, including to a significant degree on personal expenses. This persistent depletion of investor funds, however, did not stop ESPOSITO from continuing to represent to prospective investors that the reverse merger was, in sum and substance, on track and right around the corner.

31. For example, between approximately August 20 and September 9, Code2Action received $3,000 from Investor 2 and $3,960 from Investor 3. Bank records reflect that ESPOSITO spent the investor funds, among other ways, as follows: $2,500 in "weekly pay" to himself, $2,110.50 to reimburse himself for reviving Code2Action's corporate status, $1,100 in cash withdrawals, approximately $358 at his children's schools, approximately $328 at restaurants in Boston, and approximately $259 for golf. By September 9, Code2Action's bank account had a balance of $20.

32. Notwithstanding the $20 balance, ESPOSITO sent multiple emails to prospective investors that same day—September 9—indicating that he would be "effectuate [a term sheet] this week" and complete a reverse merger "within 21 days." Days earlier, ESPOSITO similarly told prospective investors that "this will all happen in coming weeks" and that Code2Action's plan was to acquire the shell company "prior to October 15." The shell company ESPOSITO referenced in the emails was a different company than the one he had previously identified.

Case 1:22-cr-10007-PBS   Document 1-2   Filed 01/07/21   Page 11 of 16

21-5018-JGD

ESPOSITO stated that the new shell company was for sale for $75,000 (rather than $225,000) and required only a $10,000 deposit (rather than $50,000). During this same period, ESPOSITO also told prospective investors that he was extending the Rights Offering deadline to September 14th.

33.     Thereafter, between September 11 and October 15, Code2Action received an additional $11,000 from Investor 2 and $1,000 from Investor 4.[3] ESPOSITO did not use the funds for the purported $10,000 deposit to purchase a shell company. Instead, bank records and receipts reflect that ESPOSITO spent the investor funds, among other ways, as follows: $6,250 in "weekly pay" to himself, over $2,000 on a personal trip to Italy, $1,800 in cash withdrawals, approximately $288 for hockey equipment, approximately $200 at restaurants and gas stations, approximately $100 at one of his children's schools, $75 for sports gambling, and $68 at a country club. By October 15—the day by which ESPOSITO had represented that Code2Action would pay $75,000 to complete the reverse merger—Code2Action's bank account had a negative balance.

34.     ESPOSITO continued to tell prospective investors that things were on track for the reverse merger. On September 23, he separately told two prospective investors—both of whom later purchased shares pursuant to the Rights Offering (Investors 5 and 1)—that he would "close the merger deal by end of October."

---

[3] Of the $11,000 from Investor 2, $9,000 was an investment pursuant to the Rights Offering and $2,000 was an investment pursuant to a separate subscription agreement. Under the separate subscription agreement, ESPOSITO caused Code2Action to sell Investor 2 shares at the discounted price of $0.0001 per share (ten times less than the $0.001 price per share available under the Rights Offering).

35.     Thereafter, on or about October 16, Code2Action received $1,000 from Investor 6. ESPOSITO also deposited $700 in cash. Bank records and receipts reflect that ESPOSITO immediately spent $198 on tickets to a professional hockey game, where he spent approximately $57 on concessions. Over the ensuing weeks, he spent the remaining funds on cash withdrawals ($130) and at, among other places, a golf course ($209), grocery stores and gas stations (approximately $295), the Capital Grille (approximately $161), and a pharmacy ($75).

36.     On or about October 22, ESPOSITO was informed that the shell previously offered for sale for $75,000 had been sold to a third party. ESPOSITO thereafter falsely told prospective investors that he had decided not to acquire that company because the sellers purportedly could not provide certain documentation he wanted. ESPOSITO told prospective investors that he had instead identified another shell company for sale for $95,000, which he was "moving forward on." On November 6, in an email to Investor 5, ESPOSITO said that he "plan[ned] to announce the [letter of intent] to merge" into the new shell company five days later. That same day, ESPOSITO emailed another prospective investor that he was "close to gathering the funds to complete a merger." Contrary to these representations, Code2Action's account balance on November 6 was $32.92.

37.     On or about November 8, Code2Action received $10,000 via a wire transfer from Investor 5. Later in November, Code2Action received another $1,000 from Investor 7. Bank records and receipts reflect that ESPOSITO spent the investor funds, among other ways, as follows: a $6,250 wire to a personal bank account, $1,700 in cash withdrawals, approximately $479 at gas stations and grocery stores, approximately $242 at restaurants, approximately $206 at Stubhub (a sports tickets broker), approximately $201 for personal internet service, $175 for

sports gambling, approximately $100 at one of his children's schools, and approximately $51 for concessions at TD Garden.  By December 8, Code2Action's bank account balance was $619.55.

38.     Notwithstanding this depletion of investor funds, ESPOSITO caused Code2Action to issue a press release on or about December 4 announcing Code2Action's intent to complete a reverse merger and representing that the "due diligence period is expected to be completed no later than the next 3 weeks and a merger closing date slated for no later than 12/31/2019."

39.     Thereafter, between December 9 and December 15, Code2Action received $4,600 from Investor 8 and $5,000 from Investor 1.  Bank records and receipts reflect that ESPOSITO spent the investor funds, among other ways, as follows: a $3,750 cashier's check to himself, $2,500 in "weekly pay" to himself, approximately $600 for his family's cellular phone service, $500 in cash withdrawals, and $75 for sports gambling.  By December 15, Code2Action's bank account balance was $2,171.80.

40.     ESPOSITO nevertheless continued to lead prospective investors to believe that the reverse merger would close within a month.  On December 13, ESPOSITO separately emailed two prospective investors (Investors 9 and 10) to solicit their investments.  He told both that, "once we close the merger by year end," the stock price of the shell company into which Code2Action was to merge could "trade higher."

41.     Beginning on or about December 16, Code2Action received $3,000 from Investor 9, $4,680 from Investor 10, $2,800 from Investor 11, and $1,500 from Investor 12.  Bank records and receipts reflect that ESPOSITO spent the investor funds, among other ways, as follows: $2,900 in cash withdrawals, a $2,500 cashier's check to himself, approximately $938 for hockey equipment, approximately $853 for tickets to a professional football game, approximately $657

at a beauty store, approximately $435 at an electronics retailer, approximately $420 at a sporting goods store, approximately $361 at a gym, approximately $252 for airline tickets for ESPOSITO and his son, approximately $212 for personal internet service, and $200 for sports gambling. By January 23, Code2Action's bank account balance was $141.01.

42. ESPOSITO did not close a reverse merger for Code2Action before the end of 2019. On December 30, Investor 8 emailed ESPOSITO, asking "Did you close on the shell?" ESPOSITO replied only "not yet" and "I will get it done." On January 2, 2020, Investor 3 asked ESPOSITO in an email "where are we on the year end stock status?" ESPOSITO replied the next day "[s]till working on it." Code2Action's account balance that day was only $2,248.65.

43. In the roughly one month between January 24 and February 28, Code2Action received $3,650 from Investor 13, $4,300.82 from Investor 14, and $1,202.68 from Investor 15. Bank records and receipts reflect that ESPOSITO spent the investor funds, among other ways, as follows: a $3,000 cashier's check to ESPOSITO's former wife, $890 in cash withdrawals, approximately $773 on airline tickets for ESPOSITO's former wife and son, approximately $593 at restaurants, approximately $473 at grocery stores and gas stations, and $50 for sports gambling. By February 28, Code2Action's bank account balance was $73.75.

44. On January 29, ESPOSITO sent an email to investors stating that Code2Action "plans to complete a reverse merger in Q1, 2020" and that it had "extended its Shareholder Rights Offering through Feb 14, 2020." To explain the delay, ESPOSITO falsely explained that Code2Action had found "two publicly traded shell companies for acquisition in Q4, 2019" but neither had provided "valid documentation during the due diligence process necessary to complete a merger." When Investor 8 asked by email on February 25, "Any progress??? Is my money lost to me?", ESPOSITO falsely responded, "Not [sic], your money is not lost."

45.     In total, during the period August 2019 through February 2020, Code2Action received over $61,000 from investors.  ESPOSITO spent all but $73.75, most of it to pay himself and for personal expenses.  On or about March 5, 2020, ESPOSITO repaid Code2Action $1,250.  The memo line on ESPOSITO's check states, "Reimbursement of expenses."

*Code2Action's Business Expenses During the Relevant Period*

46.     During an interview with the SEC on or about August 12, 2020, ESPOSITO stated that Code2Action's business expenses during this period included paying the Third-Party Platform provider, as well as expenses paid to Google and Adobe.  Review of Code2Action's bank records indicate that these and other possible business expenses, in total, accounted for less than $2,000 of Code2Action's spending.

*ESPOSITO Admissions*

47.      During two interviews with me in August and September 2020, Esposito acknowledged and admitted that: (i) he used Code2Action funds for personal expenses, including expenses associated with a trip he took with his girlfriend to Italy; (ii) he did not disclose his SEC final judgment or bar orders to prospective investors; and (iii) he did not disclose to prospective investors that Code2Action lacked its own "technology" and was instead white-labelling a text messaging service offered by the Third-Party Platform.  ESPOSITO also contended that, upon effectuating a reverse merger for Code2Action, he planned to step down as CEO due to his SEC bar orders.  ESPOSITO acknowledged and admitted that he did not disclose this plan to prospective investors.  (In fact, email records reflect that he explicitly told Investor 1 on October 26, 2019 that he planned to maintain control of Code2Action after the reverse merger.)

21-5018-JGD

*Investor Interviews*

48. I have interviewed 11 of the investors who purchased Code2Action shares from ESPOSITO during this time period. All of them indicated that they believed their funds would be used only for business purposes, and all but three indicated that they believed the funds would go, at least in part, toward the purchase of a shell company, and that the reverse merger was important to them and a reason they invested.

## CONCLUSION

49. Based on my knowledge, training, and experience and the facts set forth in this affidavit, I have probable cause to believe and I do believe that ESPOSITO committed securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

Respectfully submitted,

_Terrence Dupont_
Terrence Dupont
Special Agent
Federal Bureau of Investigation

Electronically subscribed and telephonically
sworn to before me on this ___ day of January 2021.
Jan 7, 2021

_Judith Gail Dein_
Honorable Judith G. Dein
United States Magistrate Judge
District of Massachusetts

16